Katharine Dwight Berry v. Commissioner.
Berry v. Commissioner
Docket No. 37312.
United States Tax Court
1954 Tax Ct. Memo LEXIS 266; 13 T.C.M. (CCH) 264; T.C.M. (RIA) 54090; March 26, 1954
*266 Loren C. Berry, Esq., 100 Broadway, New York, N. Y., for the petitioner. Joseph Landis, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The respondent determined a deficiency in the income tax of petitioner for the year 1947 in the amount of $294.53. The principal issue is whether petitioner's stock in Reinforced Paper Bottle Corporation became worthless during the year 1947. Findings of Fact Some of the facts have been stipulated, and the stipulation is hereby adopted as part of the findings. Petitioner, a resident of New Haven, Connecticut, filed her income tax return for the taxable year with the collector of internal revenue for the district of Connecticut. Reinforced Paper Bottle Corporation (hereinafter referred to as "Reinforced"), a Delaware corporation, was incorporated on January 1, 1923. Its authorized capital stock consisted of 50,000 shares of Managers stock, 225,000 shares of Class A stock, and 225,000 shares of Class B stock, shares of each class having a par value of $10 per share. The Managers stock of Reinforced was the only voting stock. It was also a participating preferred stock. Managers stock and Class A *267 stock were entitled to receive cumulative dividends at the rate of 7 per cent per annum before any dividends could be paid to Class B stock, and the Managers stock was in addition entitled to a two-fifths participation in any other dividends paid. On or about January 2, 1923, Mrs. Lydia B. Koch received from Reinforced in exchange for certain patent applications, plans and designs for a particular paper milk bottle, 40,000 shares of Managers stock, 30,000 shares of Class A stock, and 30,000 shares of Class B stock. On or about February 14, 1929, Reinforced issued to Mrs. Koch an additional 25,000 shares of Class A stock and an additional 75,000 shares of Class B stock (in addition to cash and notes in the total amount of $60,009.49) in consideration for services claimed by her to have been rendered to the corporation, disbursements claimed to have been made, and for her relinquishment of a claim to a royalty of 10 cents per 1,000 of the paper bottle to be manufactured and sold by Reinforced. Subsequent to 1929 the outstanding stock of Reinforced consisted of 48,800 shares of Managers, 85,825 shares of Class A, and 132,554 shares of Class B. From time to time Mrs. Koch sold shares *268 of the stock of Reinforced to the public. One of the purchasers was the petitioner, who in 1933 and 1934 acquired from Mrs. Koch the following: Purchase Price
134 shares
Class A stock
$ 1,334.00
785 shares
Class B stock
16,686.00
105 shares
Managers stock
5,250.00
$23,270.00 Petitioner has held these shares up to the time of this proceeding. In 1933 Reinforced organized a subsidiary, Safety Service Milk Bottle Corporation, all of the stock of which was owned by Reinforced. From the time of the organization of Reinforced in 1923 until 1944 Mrs. Koch was its president and chief executive officer and managed and controlled its business. Prior to January, 1942, when she transferred her voting stock to voting trustees, she had voting control of the corporation. After February 14, 1929, Reinforced caused machinery to be built and operated in the manufacture and production of certain paper milk bottles. The machinery consisted of a machine for producing paper quart bottles and two machines for producing paper pint bottles. On or about January 30, 1933, Reinforced granted Safety Service an exclusive right or license to manufacture these bottles in *269 the United States, to be produced under and by virtue of the patents, plans and designs formerly owned by Mrs. Koch and transferred by her to Reinforced. The bottles thereafter manufactured by Safety Service were completely adequate as containers for milk and as a substitute for glass bottles. Approximately thirty dairies used these bottles during 1939. The machines developed by Reinforced were used soley for the purpose of demonstrating to potential licensees the practicality and commercial possibilities of the paper bottles and of the machines themselves. The manufacture, sale and distribution of the bottles by Safety Service was for the purpose of demonstrating the commercial practicability of these products and of gaining the experience of actual distribution, and was not expected to produce a profit. Reinforced's ultimate objective was to enter into profitable royalty arrangements with licensees who would manufacture and distribute machines on which it held patents. However, notwithstanding the actual manufacture of paper bottles by Reinforced's subsidiary for dairies, the machinery and equipment developed by Reinforced for such manufacture were inefficient and unsuitable for *270 commercial production because of the insufficient number of bottles capable of being manufactured by them. Shares of Reinforced stock which Mrs. Koch had acquired as aforesaid were sold and caused to be sold by her to the public and she received the proceeds of such sales in the aggregate sum of approximately $1,024,454.06. From the money so collected from the sale of her stock, Mrs. Koch, from time to time, made loans to Reinforced and to Safety Service, said loans bearing interest at the rate of 6 per cent per annum. The total amount of such interest up to 1939 was $281,398.63. The approximate amount loaned in cash by Mrs. Koch to Reinforced and to Safety Service was $656,297.92 of which amount Reinforced received $316,458.29. Mrs. Koch caused Reinforced to reimburse or credit her on account of personal expenses incurred by her in the sale of her personal stock and to pay her income taxes, traveling expenses, expenses for entertainment and other personal expenses. Between 1923 and 1939 Reinforced and Safety Service issued to Mrs. Koch promissory notes totalling $1,194,984.56, including the promissory notes issued for the $656,297.92 loaned by her to the two corporations, and including *271 some notes issued to her on account of salary. Mrs. Koch made misrepresentations to the public in connection with the sale of her stock. In the fall of 1939 Reinforced became involved in litigation because of its methods of financing, and misrepresentations made in connection with the sale of its stock. Its business came to a standstill, and its machines were dismantled and placed in dead storage. In the fall of 1939, the Attorney General of the State of New York brought suit in the name of the People of the State of New York as plaintiff against Reinforced, Safety Service and Mrs. Koch as defendants (hereinafter referred to as "the Martin Act proceeding") charging violations of Article 23-A of the New York General Business Law, known as the Martin Act. In the Martin Act proceeding temporary and permanent injunctions were granted restraining Mrs. Koch, Reinforced and Safety Service from the issuance, sale, promotion, negotiation, discount or distribution of any securities of the two corporations, and a receiver was appointed on March 25, 1940, to take charge of all property derived by any of them by means of fraudulent practices in the sale of the stock of Reinforced. Judgment *272 entered on March 25, 1940, in the Martin Act proceeding appointed Max M. Hirson, Esq., an attorney, as receiver of "all property derived by the defendants * * * by means of fraudulent practices * * * in the sale of the stock of Reinforced", and that judgment directed the said receiver to liquidate "for the benefit of all persons intervening in this action and establishing an interest in such property". The trial judge in the Martin Act proceeding stated in his opinion dated February 16, 1940: "The evidence also shows that the product has merit, but unless steps are taken to make the machines suitable for commercial use immediately, the stockholders stand to lose their entire investment. * * *" Later, on May 3, 1940, he authorized the receiver, Max M. Hirson, to solicit contributions from the stockholders and creditors of Reinforced to a common fund for use by the receiver in his discretion in taking such steps and proceedings as might be necessary to conserve the assets and property of the receivership for the benefit of those interested therein. The stockholders did not abandon the corporation because of the Martin Act proceeding. As soon as it was instituted a group of stockholders *273 formed a Stockholders Protective Committee of Reinforced (hereinafter referred to as the "Stockholders' Committee"). This Committee wrote to the stockholders of Reinforced that unsuccessful attempts had been made to secure the cooperation of the Martin Act receiver, and that the Committee had therefore decided to appeal to the Federal courts for protection. Thereafter this Stockholders' Committee became a dominant influence in the affairs of Reinforced. It was supported by stockholders holding a majority of the stock. Resolutions adopted by the stockholders at a meeting on March 17, 1941, gave the Stockholders' Committee broad powers. From 1939 through 1948 the Stockholders' Committee was the principal agency through which the stockholders provided financial support to Reinforced. On April 16, 1940, three weeks after entry of judgment in the Martin Act proceeding, and before the Martin Act receiver obtained possession of the property of Reinforced, it filed a petition for an arrangement with its creditors under Chapter XI (Chandler Act) of the Federal Bankruptcy Act in the United States District Court for the District of Delaware, No. 1356 in reorganization proceedings, and obtain *274 an order restraining the Martin Act receiver from taking possession of any of its property. The petition represented that Reinforced was insolvent. In summary, the assets and liabilities of Reinforced as represented in the schedules attached to the petition for an Arrangement were as follows: Assets
Furniture and fixtures
$ 50.00
Machinery, fixtures and
tools
2,312,014.37 *
Patents, Copyrights and
Trademarks
1,035,191.45 **
Debits due on open account
3,248.14
Deposits of money in bank
and elsewhere
29.77
Total
$3,350,533.73
*275 Liabilities
Taxes due United States
$ 44.20
Taxes due State of Delaware
1,134.00
Taxes due State of New
York
66.30
Secured claims
757.25
Unsecured claims
912,519.42
The Stockholders' Committee gave the following reason for filing the petition for an arrangement in a letter dated June 2, 1941, to the stockholders of Reinforced: "* * * Under the Martin Act, the Receiver has only the power to liquidate, he cannot carry on the Corporation's business * * * Since it was the unanimous opinion of your Committee that liquidation would result in a total loss of the stockholders' investment, we have devoted our efforts to prevent this. Accordingly, we took recourse to the Federal Courts in order to free the Corporation from the burden of the Receivership and put the Corporation back in business." The petition for an arrangement served the double purpose of scaling down Mrs. Koch's creditor claims and of avoiding the real or imagined danger of liquidation by the Martin Act receiver by invoking Federal jurisdiction. The legal steps sponsored by the Stockholders' Committee prevented the Martin Act receiver from getting possession of Reinforced's patents and *276 machinery. With the exception of the Stockholders' Committee, Mrs. Koch was the only substantial creditor of Reinforced. All of her claims against the corporation were in fact cancelled or subordinated by her or made payable only when funds were available in the board of directors' opinion by an agreement dated January 14, 1942, by and between Mrs. Koch, the Stockholders' Committee and Reinforced, which agreement is hereinafter referred to as the "Subordination Agreement". Under the terms of the Subordination Agreement, Mrs. Koch was recognized as holding claims against Reinforced in the amount of $893,491.47, composed of corporate notes in the total amount of $669,463.13 and amounts due on open account totaling $224,028.34. By the terms of the Agreement, Mrs. Koch received notes of the corporation at par for the $224,028.34 of open account indebtedness, and $200,000 face value of Certificate of Indebtedness for an equivalent (face) amount of notes. She agreed to the cancellation of $262,438.90 of notes. The Certificates of Indebtedness were to bear interest at the rate of 6 per cent per annum, interest and principal payable when, in the opinion of the Board of Directors, sufficient *277 funds were available for that purpose. The new notes issued and the old notes still held by Mrs. Koch were not to bear interest and were to be subordinate to claims for new money that might be borrowed by Reinforced. The aggregate dividends paid to Mrs. Koch on stock of the company held by her and payments made to her on account of the corporate notes was not to exceed the total dividends paid to other stockholders of all classes receiving dividends in any calendar year. On the payment of amounts in excess of $132,578.56 on the Certificates of Indebtedness issued to Mrs. Koch, plus an additional amount equivalent to interest ultimately determined to be payable on the Federal and State income tax claims against Mrs. Koch, the other stockholders would be entitled to an amount equal to such excess before any amount would be payable on account of the corporate notes. In the case of insolvency or bankruptcy, or appointment of a receiver for the corporation, Mrs. Koch's former claims, except for $98,590.65, were to be reinstated to their former priority position. One-half of any monies paid to Mrs. Koch by reason of her creditor position in insolvency or bankruptcy she agreed to *278 hold in trust for stockholders other than herself. Under a Voting Trust Agreement dated January 14, 1942, Mrs. Koch surrendered voting control of Reinforced by transferring a majority of her voting stock to voting trustees. Based upon the Subordination Agreement, the Voting Trust Agreement and other papers, Justice Valente made an order on January 19, 1942, fixing the fees and disbursements of the Martin Act receiver and of his counsel at $4,500, directing the Stockholders' Committee to pay that amount, and discharging the Martin Act receiver of Reinforced, Safety Service and Mrs. Koch upon payment of his fees and disbursements and those of his counsel and upon the dismissal and termination of Reinforced's arrangement proceedings in Delaware. Thereafter on January 24, 1942, Reinforced's proceeding in the District Court of Delaware for an arrangement under the Chandler Act was dismissed. The $4,500 due to the Martin Act receiver and his counsel was paid. During the period of litigation from October 1939 to January 1942 the Stockholders' Committee raised substantial amounts of money to pay Reinforced's bills and the cost of protecting it through the litigation during 1940 *279 and 1941. One of the resolutions adopted at the meeting of stockholders of Reinforced on March 17, 1941, directed the Stockholders' Committee to carry out plans for the rehabilitation of Reinforced. Thereafter, Charles Z. Klauder, the Chairman of the Stockholders' Committee, and Mr. Jacobs, the accountant for Reinforced, with advisory help from Mrs. Koch, prepared some detailed schedules entitled "Budget for the Rehabilitation of the Reinforced Paper Bottle Corporation", hereinafter called the "Rehabilitation Budget". The Rehabilitation Budget contemplated the reassembly and operation of Reinforced's three bottle manufacturing machines, improvements on the quart bottle machine to speed up its production and to eliminate one operator, a change over from air to mechanical feed in the automatic feed unit of the pint bottle machine, a possible change over from electricity to gas in paraffin heating for the coating unit, the designing of a capping machine for capping bottles, and the conversion of one of the pint bottle machines to a half-pint bottle machine. The Stockholders' Committee paid existing obligations listed in the Rehabilitation Budget. Within the first six months *280 following the discharge of the Martin Act receiver, the Stockholders' Committee obtained a factory at 120 Sanford Street, New Brunswick, New Jersey, moved and cleaned the many thousands of parts of the bottle machines in preparation for their reassembly, reassembled the quart bottle machine, opened a bank account at the New Brunswick Trust Company, and released two mailings to the twelve hundred stockholders of Reinforced reporting these activities and calling for financial support. Two machines were reassembled in the factory at New Brunswick, a quart and a pint machine. On July 27, 1942, the Stockholders' Committee advised the stockholders that - "The Army is testing the bottle. Other manufacturers are deeply interested. There is a shortage in tin. There is no shortage of our materials. Glass, because it is heavy and bulky, requires great numbers of freight cars for transport. Our bottle is lightweight and strong. It is needed today." On July 20, 1943, Mrs. Koch wrote to Val Beach, who later became secretary of the company, that Safety Service had taken its first order for an estimated thousand bottles per day, but that other business was not being followed up because the *281 company hesitated to do so "until we are in a position to make our deliveries". On October 4, 1944, Mrs. Koch wrote the directors of Reinforced that the plant of the operating company, Safety Service, had been completely assembled ready for commercial operation as soon as materials "of our specification are readily available" and that many negotiations for building machines were well under way. During October 1944, changes were made in the management of Reinforced and of the Stockholders' Committee. Fred G. Kraut became president and director of Reinforced in place of Mrs. Koch, and Ralph Marshall became vice president and director in place of Charles Z. Klauder. Marshall also succeeded Klauder as chairman of the Stockholders' Committee. On November 30, 1944, Kraut, as president, wrote the stockholders of Reinforced, in part, as follows: "1. The manufacturing plant of your subsidiary company (Safety Service Milk Bottle Corp.) has been completely reestablished at New Brunswick, and our paper milk bottles are being delivered to dairies on a small scale. Our inability to obtain a sufficient quantity of paper to our specifications, due to war time rationing, has caused us to turn *282 away orders from many dairies and to run the plant with a skeleton organization for demonstration to interested people. "2. An experienced and successful negotiator has been engaged under contract to negotiate an agreement with some suitable company for the manufacture of our paper bottle machines and their distribution on a royalty basis. Several excellent companies, capable of doing the job, have been contacted, and preliminary negotiations conducted, but due to the uncertainties of wartime controls of big business and the size of the proposal, these negotiations are of necessity slow. Some companies were assigned war contracts, which caused them to withdraw their interest for the time being. "3. Negotiations are under way with representatives of a company in Mexico for 25 machines, in England for 300, and in various States and Counties of our own country for quite a number. These negotions, however, are dependent upon our closing a contract with a machine builder. "4. The war years have brought tremendous interest in paper containers, and * * * it seems that only the shortage of paper stocks have [had] prevented greater strides in the industry. * * *
"It is imperative *283 at this time that we, the officers and directors, receive the financial support of the stockholders, so that we may keep the company liquid. It is important that the New Brunswick plant be kept operating, even though profitless. The companies have some unpaid taxes and current accounts which should be paid at once, and we should be relieved of the constant drill to raise money among ourselves, so that more time can be spent on constructive lines." * * *
The stockholders of Reinforced were solicited on several occasions, beginning in 1942, to make contributions through the Stockholders' Committee for the benefit and use of Reinforced. Contributions received were deposited to the account of the Stockholders' Protective Committee in the New Brunswick Trust Company. The total amount of the deposits in the years 1942 to 1948 was as follows: $ 7,521.32 in 1942, 27,789.83 in 1943, 15,721.05 in 1944, 10,373.89 in 1945, 9,900.78 in 1946, 3,527.56 in 1947, 727.17 in 1948 Some of the stockholders' contributions were in the form of loans to the Stockholders' Committee, and stock of Reinforced "contributed by several stockholders for that purpose" was offered as an added inducement *284 for such loans. Reinforced agreed to repay loans obtained through the Committee "whenever in the opinion of its directors, sufficient funds are available for that purpose." The operations of Safety Service during the years 1943 to 1947 consisted of operating the machines it had received from Reinforced, making some improvements thereon, and producing quart and pint paper milk bottles. Although the bottles produced were satisfactory, Safety Service was not able financially to have all the machine work done that was necessary to perfect the machines so that they would produce the bottles efficiently and profitably. In the latter part of 1946 representatives of the National Paper Bottle Corporation (hereinafter referred to as "National") investigated the possibilities of the paper container business and had some engineers look at the machines operated by Safety Service. By the end of 1946 Reinforced and Safety Service ceased manufacturing operations. On March 17, 1947, an agreement was entered into between Reinforced and National wherein Reinforced granted National "the sole and exclusive right and license to manufacture, sell and use paper bottles, to make, use and sell machines *285 for forming or making paper bottles, and to use methods of forming or making paper bottles, and the right to grant licenses to others to manufacture, sell and use paper bottles * * *" embodying inventions described and claimed in Letters Patent owned by Reinforced. Reinforced also agreed to transfer to National, upon request, all machines owned or controlled by Reinforced designed to make paper bottles or parts thereof, together with all drawings, patterns, tools, spare parts, etc., pertaining thereto. National, for its part, agreed to assign to Reinforced all improvement patents that might be developed by National, and to "use its best efforts to diligently promote and exploit the business of making, selling and using paper bottles and machines for the manufacture of paper bottles, and of selling and using methods of forming or making paper bottles, embodying the inventions" or improvements thereon. National intended to lease machines for forming and making paper bottles, and it agreed to pay royalties to Reinforced on paper bottles made by any machines covered by Reinforced's patents or improvement patents. National's total resources at the time it entered into the agreement *286 of March 17, 1947, amounted to about $25,000 to $30,000. On October 28, 1947, the president of Reinforced wrote its stockholders as follows: "On November 30, 1944 you were advised that our plant at New Brunswick had been opened, machines set up and operating - for the purpose of further development and ultimate leasing of our method of making paper bottles. "Until the present time it has been impossible to make anything but nominal progress, due to many obstacles; lack of paper, inefficiency of machines and inability of industry to enter into negotiations. When the war ended most large industrial firms had so much post war work that they could not afford to think about new and untried ventures. "Our machines were kept running however, and the output though small helped to alleviate the bottle shortage for a local dairy. Before closing we were able to give this dairy a backlog of 50,000 bottles. "During the period engineering representatives from many large firms inspected and studied our machines and methods. They expressed great interest in our bottle and patents thereon. While much was learned we soon discovered that no one would be willing to close negotiations because *287 of the inefficiency of machine demonstrations, frequent breakdowns and slow and imperfect output. "In the summer of 1946 a large New York Banking firm asked for and was given an option franchise on our patents for a period of four months during which time their patent attorney made a very expensive and exhaustive research of the entire paper bottle field. "While his report on our patents was favorable it indicated that additional development work would be needed. The banking firm dropped the option when they decided not to go into the development field. However the report was given to us and has been helpful in later negotiations. "In March of 1947 after months of negotiation and study your Directors were able to sign a royalty contract with the National Paper Bottle Corporation, a New York firm, who agreed to do this necessary development work at their own expense: to build a new and modern machine embodying our patents. This contract provides for royalty payments to your company, when machines are perfected and placed on the market by this or any other company. "The plant at New Brunswick was then closed and machines placed in dead storage where they may be studied whenever *288 the need may arise. "The National Paper Bottle Corp. has employed at considerable expense a reliable firm of engineers in New Jersey to build a new quart machine, using our patents and models as guides but with the express purpose of perfecting a new and modern machine of greatly simplified operation. We are glad to be able to report that your officers have followed the progress of drafting, design, and building of the new machine and believe that it may be finished this Winter. More than half the number of operations in the forming of the bottle have been eliminated. Clumsy machinery has been replaced with modern methods. The entire unit will be smaller and completely accessible for repairs. "While the engineers are confident that they have solved most important problems on paper the final result cannot be known until the machine is assembled and tested. "Your officers, serving without remuneration, have spent much time, money and effort on behalf of this company and are very gratified to be able to give you this encouraging news. You will be advised of further developments." Since the contract of March 17, 1947, was executed National has been engaged in developing and building *289 two machines to produce paper bottles at a cost of approximately $186,000. These two machines are not yet finished, and when they are completed National intends to lease them and not operate them for production. None of the features of the new machines are covered by patents belonging to Reinforced. In the operation of the machines, however, National would have to use two of the patents on paper bottles belonging to Reinforced which have not expired. At the time of the hearing National had not leased any machine and had not paid Reinforced anything under the contract. From the date of incorporation of Reinforced up to the time of the hearing of this proceeding no profit was ever realized by Reinforced or Safety Service from the sale of their products or from any other corporate business. The stock of Reinforced owned by the petitioner became worthless during the year 1947. Opinion RAUM, Judge: The Commissioner's notice of deficiency in this case is based on the ground that the stock became worthless prior to 1938. He now argues that the stock became worthless prior to 1946 or, in the alternative, that it did not become worthless at all at any point up through 1947. Petitioner *290 contends that the stock became worthless in 1947, or, in the alternative, in 1946. [1]
We have found as a fact that the stock became worthless in 1947. The evidence was confusing, and could support at least several different findings on this issue. The finding that we made reflects our best judgment on all the evidence. Prior to 1947, except for the period 1939 to 1942 when the activities of Reinforced were halted by litigation, Reinforced was attempting to develop and improve its paper bottle machines. It operated the machines through a subsidiary, selling the paper bottles presumably to nearby dairies. Its basic objective was to perfect the machines so that they would be commercially feasible and then to enter into profitable royalty arrangements with licensees who would undertake to manufacture and distribute the machines under Reinforced's patents. This goal was never reached. However, throughout the period prior to 1947 there were grounds *291 for believing that this objective was attainable. Under the auspices of the Stockholders' Protective Committee, the stockholders began in 1942 to contribute substantial additional amounts to the enterprise in the hope that it would achieve success. After 1943, when the stockholders put up $27,789.83, the amounts began to diminish. By 1947 the contributions had fallen to $3,527.56, and the comparatively nominal contribution of $727.17 in 1948 was apparently merely for the purpose of winding up the corporate affairs. In 1947 the machines were no longer in operation and the evidence shows that the office was closed. We are satisfied that in that year there was no longer any reasonable expectation that the corporation would ever develop its machines so as to make them commercially feasible, and that it undertook merely to salvage what it could by giving exclusive patent rights to National on the outside chance that National might be able to do better and thereby provide it with some royalties. Thus far, notwithstanding National's efforts, Reinforced has received nothing from National. The question before us calls for practical judgment. The law does not require the taxpayer to be an *292 "incorrigible optimist." . Decision will be entered for the petitioner. Footnotes
*. This amount represents the total of the "Machinery & Development Account" on the books of Reinforced as of April 1, 1940. It includes the actual cost of the machines as well as the cost of all experimental work since the organization of Reinforced in developing the machines. The actual value of the machines is substantially less than the amount assigned. ↩
**. This amount represents the sum at which Reinforced's patents were carried on its books. It includes the total par value of the stock given as consideration for the inventions and patents acquired by Reinforced, as well as patent attorney's fees, filing charges, and other expenses, in connection with the same.↩
1. If petitioner should succeed in establishing 1946 as the year of worthlessness, her position here is that a carry over from 1946 would eliminate the 1947 deficiency. Respondent contests the availability of a carry over on this record.↩